WILLIAM R. TAMAYO, SBN 084965 (CA)
JONATHAN T. PECK, SBN 12303 (VA)
CINDY O'HARA, SBN 114555 (CA)
PETER F. LAURA, SBN 116426 (CA)
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
San Francisco District Office
Phillip Burton Federal Building, 5th Floor West
450 Golden Gate Avenue, POB 36025
San Francisco, CA 94102
Telephone No. (415) 522-3035
Fax No. (415) 522-3425
Cindy.OHara@eeoc.gov

*Attorneys for Plaintiff EEOC*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>    Plaintiff,<br><br>    vs.<br><br>WALGREEN CO.,<br><br>    Defendant. | Case No.: CV 11-4470 WHO<br><br>**PLAINTIFF EEOC'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: April 9, 2014<br>Time: 2:00 p.m.<br>Before: Hon. William H. Orrick<br>Courtroom: 2 |

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................................... 1

II.   STATEMENT OF THE FACTS ................................................................................. 1

      A.    Background on Ms Hernandez ........................................................................ 1

      B.    Incident Giving Rise to Ms. Hernandez's Termination ................................. 2

      C.    Disputed Facts Concerning Ms. Hernandez's Termination, and Contradictions
            Among Walgreens's Officials as to These Facts ........................................... 3

            1.    Although Ms. Hernandez Told Both Store Manager Balestieri and Loss
                  Prevention Supervisor Clark that She Ate the Chips Because Her Blood
                  Sugar Was Low, and Gave Clark a Written Statement to that Effect, Both
                  Deny that She Told Them ...................................................................... 3

            2.    Clark's Testimony and His Report is Repeatedly and Directly in Conflict
                  with Holly Potter's Testimony Regarding Whether Ms. Hernandez was
                  Eating Chips at the Register, and Whether He Even Talked to Potter ............ 5

            3.    Clark's Report is Contradicted by Balestieri's Testimony Regarding
                  Whether the Two of Them Met with Ms. Hernandez After Clark's
                  Interview .............................................................................................. 6

            4.    Balestieri's Memory and Credibility as to What Transpired on September 17
                  is Further Called into Question Regarding What Happened to the Bag of
                  Chips ..................................................................................................... 6

            5.    Defendant's Innuendo that Ms. Hernandez Did Not Ever Pay for the Chips,
                  Only Raised Now, Five and a Half Years After the Incident, is Contradicted
                  by the Fact that Clark Reviewed the Electronic Records at the Time of the
                  Incident and Reported that Ms. Hernandez Paid For the Chips ..................... 7

      D.    Facts Concerning Ms. Hernandez's Diabetes ............................................... 8

III.  SUMMARY JUDGMENT STANDARD .................................................................. 9

IV.   ARGUMENT ........................................................................................................... 10

      A.    Charging Party Hernandez's Alleged "Misconduct" was Caused by Her Disability
            and is Therefore Part of Her Disability; and as such, it is Not a Justifiable Basis
            for Her Termination ...................................................................................... 10

      B.    When an Employer Knows of an Employee's Disability, and Recognizes that the
            Employee is having Difficulty as a Result, the Employee does not Specifically
            Need to Request a "Reasonable Accommodation" ....................................... 17

      C.    The Ninth Circuit has not Created an Exception to Employer ADA Obligations
            for an Employee's Failure to Perfectly Control the Symptoms of His or Her
            Disability ....................................................................................................... 19

      D.    Defendant's Position that Plaintiff must Establish Pretext is Incorrect and in any
            Event Plaintiff has shown Pretext in this Case ............................................ 21

      E.    The Commission is not Barred from Litigating this Case ............................ 22

      F.    Punitive Damages are Available to the Commission in this Case ................ 23

V.    CONCLUSION ........................................................................................................ 24

# TABLE OF AUTHORITIES

CASES                                                                                           Page(s)

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)........................................................................................................9

*Brown v. City of Salem,*
  2007 WL 671336 (D. Ore. 2007).................................................................................13

*Brown v. Lucky Stores,*
  246 F.3d 118 (9th Cir. 2001) ........................................................................................17

*Bultemeyer v. Fort Wayne Community Schools,*
  100 F.3d 1281 (7th Cir. 1996) ................................................................................18, 19

*Celotex Corp. v. Catrett,*
  477 U.S. 317, 106 S.Ct. 2548 (1986)............................................................................9

*Chevron U.S.A. Inc. v. Echazabal,*
  536 U.S. 73, 122 S.Ct. 2045 (2002)............................................................................20

*Chuang v. Univ. of Cal. Davis,*
  225 F.3d 1115 (9th Cir. 2000) ......................................................................................10

*Dark v. Curry County,*
  451 F.3d 1078 (9th Cir. 2006) ......................................................................................12

*Den Hartog v. Wasatch Academy,*
  129 F.3d 1076 (10th Cir. 1997) ........................................................................11, 12, 14

*Echazabal v. Chevron USA, Inc.,*
  226 F.3d 1063 (9th Cir. 2000) ......................................................................................20

*Echazabal v. Chevron USA*, Inc.,
  336 F.3d 1023 (9th Cir. 2003) ......................................................................................20

*Fischer v. Forestwood Co., Inc.,*
  525 F.3d 972 (10th Cir. 2008) ........................................................................................9

*Gambini v. Total Renal Care, Inc.,*
  486 F.3d 1087 (9th Cir. 2007) ................................................................................12, 13

*Humphrey v. Memorial Hospitals Association,*
  239 F.3d 1128 (9th Cir. 2001) ................................................................................10, 11

*Jones v. American Postal Workers Union,*
  192 F.3d 417 (4th Cir. 1999) ........................................................................................15

*Kolstad v. Am. Dental Ass'n,*
  527 U.S. 526 (1999)......................................................................................................23

*Lam v. Univ. of Haw.,*
  40 F.3d 1551 (9th Cir. 1994) ........................................................................................10

*Mcalindin v.County of San Diego,*
192 F.3d 1126 (9th Cir. 1999) ...................................................................22

*Menchaca v. Maricopa Cmty. Coll. Dist.,*
595 F.Supp.2d 1063 (D.Ariz.2009) ........................................................13, 14

*Newland v. Dalton,*
81 F.3d 904 (9th Cir. 1996) ......................................................................13

*Norris v. Allied Sysco Food Services, Inc.,*
948 F.Supp. 1418 (N.D. CA 1996) ...............................................................18

*R.B. Ventures, Ltd. V. Shane,*
112 F.3d 54 (2nd Cir 1997)........................................................................10

*Ray v. Kroger Co.,*
264 F.Supp.2d 1221 (S.D.GA. 2003)............................................................15

*Raytheon Co. v. Hernandez,*
540 U.S. 44 (2003)...................................................................................15

*Reeves v. Sanderson,*
530 U.S. 133 (2000)........................................................................9, 10, 21

*Schnidrig v. Columbia Mach., Inc.,*
80 F.3d 1406 (9th Cir. 1996) .....................................................................10

*Sena v. Weyerhaeuser,*
1999 U.S. App. LEXIS 499 (9th Cir. 1999) ...................................................15

*Siefken v. Village of Arlington Heights,*
65 F.3d 664 (7th Cir. 1995) ......................................................................19

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.,*
809 F.2d 626 (9th Cir. 1987) ....................................................................10

*U.S. Airways, Inc. v. Barnett,*
535 U.S. 391 (2002)................................................................................22

*Walsted v. Woodbury County,*
113 F.Supp.2d 1318 (N.D. IA 2000) .......................................................14, 15

**STATUTES**

42 U.S.C. § 12114(c)(4)............................................................................15

42 U.S.C. § 1981a(b)(1)............................................................................23

42 U.S.C. § 2000e-12(b)............................................................................22

42 U.S.C § 12101 *et seq*...........................................................................22

**RULES AND REGULATIONS**

56 Fed. Reg. 35, 733 (1990) .....................................................................22

Fed.R.App.P. 32.1 ..................................................................................................15

Fed.R.Civ.P. 26 ........................................................................................................7

Fed.R.Civ.P. 56 ........................................................................................................9

**OTHER AUTHORITIES**

9A C. Wright & A. Miller, Federal Practice and Procedure § 2529 (2d ed.1995) .........................9

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Josefina Hernandez worked 18 years for Defendant Walgreens without incident until one fateful day when, suffering from an attack of hypoglycemia due to her diabetes, she opened and consumed a few potato chips from a $1.39 snack-size bag to stabilize her blood sugar.  For this transgression of Walgreens's "anti-grazing policy," Ms. Hernandez was terminated.  Even though Ms. Hernandez subsequently paid for the chips; even though store management knew she had diabetes; even though she told the store manager and the loss prevention supervisor that she had consumed the chips because her blood sugar was low; and even though, when asked by Walgreens's loss prevention supervisor to write a statement as to why she consumed the chips, she wrote "My sugar low, not have time," Walgreens terminated her employment without any consideration of her disability.  Walgreens asserts that it took this action because of its "zero tolerance" for "grazing," and its written, across-the-board policy that "Walgreens never has to excuse an employee [with a disability] for violating a uniformly applied conduct rule."

For these reasons, Walgreens did not treat Ms. Hernandez's diabetes-related eating of the chips as part of her disability, as required by the clear law of the Ninth Circuit, nor did it engage Ms. Hernandez in any sort of interactive process to see if it could accommodate her disability, and instead terminated her employment.  Walgreens's action in terminating Ms. Hernandez's employment because of her disability-related conduct clearly violates the Americans with Disabilities Act, and summary judgment should not be granted in its favor.

**II.    STATEMENT OF THE FACTS**

**A.    Background on Ms Hernandez**

Josephina Hernandez was diagnosed with Type II diabetes in 1995.  (O'Hara Decl., Exh. 1 [Hernandez Depo, v.I] [1] at 65:9-19.)  In 2008 and presently, she has been an Insulin dependent diabetic.  (*Id.* at 33:11-14, 80:19-81:5.)

Ms. Hernandez was hired at Walgreens in November 1990.  (O'Hara Decl., Exh. 2

---

[1]  Although Defendant references the Hernandez deposition testimony as Days 1-4, because she did not actually testify on Day 1, Plaintiff designates the testimony as Volumes I through III.

[Hernandez Depo, v.II] at 178:14-19.)  Her managers at Walgreens considered her to be a good employee.  (O'Hara Decl., Exh. 3 [Marsh Depo] at 9:10-17; Exh. 4 [Potter Depo] at 17:11-17.)  The store manager who terminated her, Robert Balestieri, viewed her as an "okay" employee.  (O'Hara Decl., Exh. 5 [Balestieri Depo] at 15:10-18)  Her former store manager, Kathy Marsh, considered her to be an honest employee.  (O'Hara Decl., Exh. 3 [Marsh Depo] at 19:19-21.)  In the fifteen years that she worked with Kathy Marsh, she had not been disciplined for any reason. (*Id.* at 9:10-19.)

### B.   Incident Giving Rise to Ms. Hernandez's Termination

On September 17, 2008, Ms. Hernandez was returning items to the shelves with a shopping cart when she noticed that she was shaking and sweating because her blood sugar level was low. (O'Hara Decl., Exh. 2 [Hernandez Depo, v.II] at 149:22-250:7, 258:1-15, 260:17-24.)  She was having a hypoglycemic attack because of her diabetes.  (O'Hara Decl., Exh. 6 [Lorber Depo] at 39:20-40:4.)  Ms. Hernandez, recognizing the urgency of the situation, grabbed a bag of potato chips from the shopping cart and ate some of them.  (O'Hara Decl., Exh. 2 [Hernandez Depo, v.II] at 258:1-15.)  She ate the potato chips because she was in the magazine aisle and there was not any candy in the immediate vicinity.  (*Id.* at 261:4-17)  She had no candy in her pocket,[2] nor was there any in the shopping cart.  (O'Hara Decl., Exh. 7 [Hernandez Depo, v.III] at 61:22-62:7.)  She began to feel better in about 10 minutes.  (*Id.* at 69:9-12.)  She then went to pay for the potato chips at the cosmetics counter, because that was where she had been instructed to pay for store items, but no one was there.  (*Id.* at 63:4-14; Exh. 2 [Hernandez Depo, v.II] at 220:13-23.)

Ms. Hernandez then put the potato chips under the counter at her cash register and returned to re-stocking items.  (O'Hara Decl., Exh. 7 [Hernandez Depo, v.III] at 63:18-64:5, 65:18-66:2.)  After that, the co-worker at her register went on break and Ms. Hernandez filled in for her.  (*Id.* at 66:9-67:11.)  Ms. Hernandez then returned to re-stocking items when she heard the Assistant Store Manager, Holly Potter, ask, "Whose chips are these?"  (*Id.* at 75:17-76:13.)  Ms. Hernandez said that the chips were hers.  (*Id.* at 78:10-13.)

---

[2] Ms. Hernandez testified she sometimes carried candy in her pocket.  (O'Hara Decl., Exh. 1 [Hernandez Depo, v.I] at 78:8-11; Exh. 2 [Hernandez Depo, v.II] at 124:19-25.)

1    Ms. Potter then went to Store Manager Robert Balestieri's office to report Ms. Hernandez for

2    taking the potato chips.  (*Id.* at 78:10-16.)  Ms. Hernandez followed her to Balestieri's office.  (*Id.* at

3    79:11-18.)  Ms. Hernandez told Balestieri that she ate the chips because her blood sugar was low,

4    and then took the chips and said she would go pay for them, which she did.  (*Id.* at 75:17-76:13,

5    89:13-17.)  For the next two weeks she was on vacation.  (*Id.* at 95:21-96:2.)

6        When Ms. Hernandez returned from vacation, she was asked to meet with Walgreens Loss

7    Control Supervisor Marcellus Clark.  (*Id.* at 96:1-5.)  She told Clark that she had eaten the chips

8    because it was an emergency situation:

9        When he start question me what happened and he's the one, you know, made me sign
10       the papers and, you know, I explained to him what happened, why I had to open the
         bag of chips.  He don't care.  He said it's supposed to be you pay before.  And I said,
11       it's an emergency when that happened, is when I opened.

12   (*Id.* at 35:8-15.)  Clark then asked her to write a statement regarding her consumption of the chips,

13   and in that statement she simply wrote:  "My sugar low, not have time."  (O'Hara Decl., Exh. 8

14   [Clark Depo Ex 1].)  Either Clark or Balestieri told her she was suspended, and then on Wednesday,

15   October 8th, she called Balestieri and he told her that she had been terminated from her employment

16   at Walgreens.  (O'Hara Decl., Exh. 7 [Hernandez Depo, v.III] at 98:22-99:3, 95:21-96:2.)

17      **C.    Disputed Facts Concerning Ms. Hernandez's Termination, and Contradictions
18              Among Walgreens's Officials as to These Facts**

19       In contrast to Ms. Hernandez straightforward recounting of the events leading to her

20   termination, Walgreens officials involved in her termination wrongly dispute whether she ever

21   informed them that her consumption of the chips was because of her diabetes.  Moreover, the

22   Walgreens officials involved dispute and contradict each other, giving rise to genuine questions as to

23   their credibility.

24       1.    Although Ms. Hernandez Told Both Store Manager Balestieri and Loss
25             Prevention Supervisor Clark that She Ate the Chips Because Her Blood Sugar
               Was Low, and Gave Clark a Written Statement to that Effect, Both Deny that
26             She Told Them

27       In contrast with Ms. Hernandez's testimony that when she went to Store Manager Balestieri's

28   office and told him that her sugar had been low when she opened the bag of chips, Balestieri asserted

1  in his deposition that Hernandez gave him "no explanation" of why she had eaten the chips; the only

2  thing that he can recall Hernandez saying, repeatedly, is "I'm in trouble aren't I?"  (O'Hara Decl.,

3  Exh. 5 [Balestieri Depo] at 16:20-17:25.)  However, as evidenced by his further testimony, Balestieri

4  would presumably never seek, nor have any interest in, any explanation from Ms. Hernandez

5  regarding why she ate the chips, since he was "absolutely certain" about terminating

6  Ms. Hernandez's employment because Defendant's "policy says if someone takes merchandise

7  without paying for it[,] it is immediate termination."  Balestieri emphasized that this is "the bottom

8  line," that there is "no gray area," and that he has "no discretion" vis-á-vis this "very strict policy."

9  (*Id.* at 26:11-17; 34:10-18.)  Given that any explanation from Ms. Hernandez would be of no

10  importance to his determination to terminate her employment, it is little wonder that Balestieri has

11  no recollection of Ms. Hernandez's explanation to him that she had eaten the chips because her

12  blood sugar was low.

13        Likewise, although Ms. Hernandez testified that she told Loss Prevention Supervisor Clark in

14  his interview with her that she had opened the bag of chips due to an emergency, Clark himself

15  testified that Hernandez simply told him that she knew that she was there because of the chips, and

16  did not say anything about not having time to purchase the chips before eating them or that her blood

17  sugar was low.  (O'Hara Decl., Exh. 9 [Clark Depo] at 27:10-28:5.)  Like Balestieri, it is little

18  wonder that Clark does not remember Ms. Hernandez telling him that she ate the chips due to her

19  low blood sugar, as he, like Balestieri, was following Walgreens "no gray area" policy that any

20  consumption of merchandise before paying automatically resulted in termination, regardless of the

21  reason.  Clark's lack of interest in the reason for Ms. Hernandez's consumption of the chips is

22  further emphasized by the fact that, although he asked Ms. Hernandez to provide a written

23  explanation for her action, *he never read it,* testifying in his deposition "I didn't understand it so I

24  didn't try to read it."  (*Id.* at 30:17-22.)  While Clark's "excuse" is that he could not understand the

25  written statement (which, in its entirety, is only six words – "My sugar low, not have time"), he

26  could have easily asked Ms. Hernandez to read it to him or tell him what it said; this he did not do.

27  / / /

28  / / /

2.   Clark's Testimony and His Report is Repeatedly and Directly in Conflict with Holly Potter's Testimony Regarding Whether Ms. Hernandez was Eating Chips at the Register, and Whether He Even Talked to Potter

In the "Case Inquiry Report" which Loss Prevention Supervisor Marcellus Clark asserted he prepared on October 7, 2008, the day after his interview with Ms. Hernandez, Clark stated that Balestieri told him that "On September 17, 2008, MGT Holly POTTER informed him that she saw HERNANDEZ eating chips at the register.  HERNANDEZ admitted to both of them that she had not paid for the chip [sic] at that time.  She did pay for the chips prior to going home for the day."

Clark's report continued:

> On October 6, 2008, I spoke to POTTER and she confirmed the statement made to Balestieri.  She said she had also counseled HERNANDEZ on several occasions about eating at the register.

> I interviewed HERNANDEZ and she made the following statement.  She admitted to eating from the bag of chips, at the register, that had not been purchased first.  She said she did pay for the chip [sic] before she went home.

> * * *

> DISPOSITION: I reviewed the facts of this inquiry with Store Manager Bob BALIESTIERI in the presence of HERNANDEZ, who repeated her admission that she was eating a bag of chips, at her register, which had not been purchased.

(O'Hara Decl., Exh. 9 [Clark Depo] at 38:9-20; Exh. 10 [Clark Depo Ex. 2].)  Clark repeated this story at his deposition, stating that he had spoken with Balestieri over the telephone approximately two weeks before his interview with Ms. Hernandez, and that Balestieri said that Ms. Hernandez had been eating chips at the register, that Potter had seen her and talked to her about it, and that Hernandez had paid for the chips later that day.  (O'Hara Decl., Exh. 9 [Clark Depo] at 23:23-24:5.)  Clark further testified that he spoke to Potter for a few minutes in the store before he spoke with Ms. Hernandez, and that Potter told him that Hernandez had come back from break, was seen eating chips at the register, that she (Potter) had approached Hernandez, and that Hernandez said she had not paid for the chips.  Clark testified that Potter told him that Hernandez had informed Balestieri that she had not paid for the chips, and that later that day, Hernandez purchased the chips.  (*Id.* at 25:12-21.)  Clark further testified that Potter told him that she had counseled Hernandez before eating at the register.  (*Id.* at 26:3-9.)

In contradiction with Clark's Case Inquiry Report and his deposition testimony, Potter

testified in her deposition that she did *not* see Hernandez eating the chips at the register, and that she had never at any time observed Hernandez eat at the register.  (O'Hara Decl., Exh. 4 [Potter Depo] at 23:20-23; 24:13-25.)  Moreover, Potter testified that as far as she knows, she never even talked to Clark about Hernandez, and has no recollection at all of either talking to Clark or Clark talking to her about Hernandez.  (*Id.* at 27:9-12, 27:20-28:2.)

> 3. <u>Clark's Report is Contradicted by Balestieri's Testimony Regarding Whether the Two of Them Met with Ms. Hernandez After Clark's Interview</u>

In addition, as stated above, in his Case Inquiry Report, Clark says that he spoke with Balestieri after his interview with Ms. Hernandez, in Ms. Hernandez's presence, and that Ms. Hernandez "repeated her admission that she was eating a bag of chips, at her register, which had not been purchased."  However, Balestieri confirmed no such meeting, let alone any "admission" by Ms. Hernandez that "she was eating a bag of chips, at her register."  In fact, Balestieri testified that when he spoke with Clark on the day of Clark's interview of Hernandez, there was no one else present in his office, "It was he and I."  (O'Hara Decl., Exh. 5 [Balestieri Depo] at 20:9-19.)  Balestieri testified that his conversation with Clark on that day "just recapped what had happened, because it had been two, two and a half weeks," and that nothing else was discussed in that conversation with Clark.  (*Id.* at 23:11-21)  Balestieri further testified that after Clark's interview with Hernandez, Clark reviewed with him what had happened in the interview, and that Clark simply told him that Hernandez "admitted to taking the chips and not paying for them."  Balestieri testified that he also did not review the voluntary statement that Ms. Hernandez had signed.  (*Id.* at 23:25-24:14.)  Thus it appears from Balestieri's testimony that Clark's report that he, Balestieri, and Ms. Hernandez met after his interview with Ms. Hernandez, and that at that purported meeting Ms. Hernandez "repeated her admission that she was eating a bag of chips, at her register, which had not been purchased" is pure fabrication.

> 4. <u>Balestieri's Memory and Credibility as to What Transpired on September 17 is Further Called into Question Regarding What Happened to the Bag of Chips</u>

Balestieri's recollection of the events is further called into question on the issue of the bag of chips ever being in his office.  While Ms. Hernandez testified that she retrieved the chips from

1    Balestieri's office and took them and paid for them, and Assistant Manager Holly Potter testified

2    twice that she took the chips to Balestieri (O'Hara Decl., Exh. 4 [Potter Depo] at 19:20-20:14, 34:18-

3    35:4), Balestieri testified that he "never saw the bag of chips" and that Potter did not bring them into

4    his office.  (O'Hara Decl., Exh. 5 [Balestieri Depo] at 19:8-10.)

5                           5.      <u>Defendant's Innuendo that Ms. Hernandez Did Not Ever Pay for the Chips,</u>
                                   <u>Only Raised Now, Five and a Half Years After the Incident, is Contradicted</u>
6                                   <u>by the Fact that Clark Reviewed the Electronic Records at the Time of the</u>
                                   <u>Incident and Reported that Ms. Hernandez Paid For the Chips</u>
7

8            Finally, there is the contradictory testimony regarding Ms. Hernandez paying for the chips.

9    In what appears to be an effort to bolster its argument that Ms. Hernandez committed "theft,"

10   Defendant has submitted a declaration from Marcellus Clark which, in Paragraph 7, states that he

11   reviewed the sales records for Ms. Hernandez's store for September 17, 2008, and he "was unable to

12   locate any record to substantiate Ms. Hernandez's claim that she ever purchased the chips."  (Docket

13   #66-1 [Declaration of Marcellus Clark in Support of Defendant's Motion for Summary Judgment or

14   in the Alternative, Partial Summary Judgment] at ¶7.)  Plaintiff is requesting separately to strike this

15   paragraph, as there is no foundation for this statement, nor have any sales records for that date ever

16   been produce to Plaintiff EEOC, either with the declaration or during the two and a half year course

17   of this litigation, in direct defiance of the disclosure provisions of Fed.R.Civ.P. 26(A)(1)(a) that a

18   party disclose all documents it intends to use in support of its case.  Moreover, when asked what he

19   did to investigate the allegations against Ms. Hernandez between the time he was initially contacted

20   by Balestieri and the time that he interviewed Ms. Hernandez, Clark testified in his deposition:

21               Part of that investigation, I talked to the store manager and the assistant manager and
                 got information from them.  I looked to see if there was any electronic journal, to see
22               if purchases were made.  You can look to see if merchandise has been purchased.
                 Each item has its own UPC number, so we can determine if something was
23               purchased.  And after those things were determined, I would -- I interviewed
                 Ms. Hernandez.
24

25   (O'Hara Decl., Exh. 9 [Clark Depo] at 20:17-24).

26           In his deposition, Clark did not say that Ms. Hernandez had not paid for the chips, and to do

27   so would contradict his own report that Balestieri and Hernandez herself, both told him that

28   Hernandez had paid for the chips prior to going home on September 17, 2008.  (O'Hara Decl.,

1    Exh. 10 [Clark Depo Ex. 2].)  Given his testimony that he had checked the electronic purchase

2    register before interviewing Ms. Hernandez, and the fact that he included without contradiction both

3    the statements from Balestieri and Hernandez herself that she had paid for the chips before she went

4    home, if Clark's review of the electronic register at the time of the incident had revealed that

5    Hernandez had in fact not paid for the chips, surely he would have included that in his report; instead

6    of including the two statements that Hernandez had in fact paid before going home.

7            Thus, Clark's assertion, five and a half years after the fact, that he can now find no record of

8    Ms. Hernandez paying for the chips, when he reported at the time of the incident that he checked the

9    electronic register and subsequently included in his report that Hernandez *had* paid for the chips,

10   demonstrates nothing more than an underhanded tactic designed to further paint Ms. Hernandez as a

11   "thief" for having eaten the chips.

12          The above contradictions between Ms. Hernandez's testimony and that of Store Manager

13   Balestieri and Loss Prevention Supervisor Marcellus Clark, and the contradictions in testimony

14   among Walgreens officials Balestieri, Clark and Assistant Manager Holly Potter, all demonstrate

15   that there are disputed facts and credibility determinations which will have to be made by the jury,

16   precluding summary judgment.

17          **D.      Facts Concerning Ms. Hernandez's Diabetes**

18          In 2008 and presently, Josephina Hernandez has been an Insulin dependent diabetic. (O'Hara

19   Decl., Exh. 1 [Hernandez Depo, v.I] at 33:11-14, 80:19-81:5.)  In 2008, her primary care physician

20   was Dr. Juanito Austria.  (O'Hara Decl., Exh. 11 [Austria Depo, v.I] at 15:24-18:5.)  Dr. Austria is

21   board-certified in internal medicine and has treated patients with diabetes.  (*Id.* at 8:15-21, 14:11-21)

22   Dr. Daniel Lorber has been retained as an expert witness in this case to testify about

23   Ms. Hernandez's medical condition.  (O'Hara Decl., Exh. 6 [Lorber Depo] at 15:9-16:3; Exh. 12

24   [Lorber Depo Ex. 1].)  He is board-certified in endocrinology and metabolism, and is board-certified

25   in internal medicine, and has treated thousands of patients with diabetes.  (O'Hara Decl., Exh. 6

26   [Lorber Depo] at 7:4-11; 24:4-25:18.)

27          People with diabetes can suffer from hypoglycemia, which is caused by low blood sugar

28   levels.  (O'Hara Decl., Exh. 11 [Austria Depo, v.I] at 27:25-28:18.)  Common symptoms of

1   hypoglycemia can include being light-headed, dizzy, feeling faint, sweatiness, and nausea.  (*Id.* at

2   27:14-28:6.)  Having a hypoglycemic episode can have severe medical consequences, including

3   coma and death.  (*Id.* at 29:16-25.)  A hypoglycemic episode can cause a person to suffer a "fight or

4   flight" response which can cause panic.  (O'Hara Decl., Exh. 6 [Lorber Depo] at 31:16-32:17.)

5   Hypoglycemic episodes can also cause cognitive impairment which can result in a person having

6   poor judgment.  (*Id.* at 30:11-25.)

7         Ms. Hernandez's response of eating potato chips was a reasonable way to get her blood sugar

8   level back up to a safe level.  (O'Hara Decl., Exh. 11 [Austria Depo, v.I] at 29:3-8; Exh. 6 [Lorber

9   Depo] at 85:12-86:3.)  The urgency of the situation, and Ms. Hernandez's need to take quick action

10  when she had a hypoglycemic attack on September 17, 2008, is best summarized by Dr. Austria

11  when he testified: "I'd much rather save her life than have her, you know, be in trouble for not

12  paying."  (O'Hara Decl., Exh. 13 [Austria Depo, v.II] at 92:9-10.)

13  **III.    SUMMARY JUDGMENT STANDARD**

14        Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a party may be awarded

15  summary judgment if it can establish that no material facts are in dispute, and it is entitled to

16  judgment as a matter of law.  Fed.R.Civ.P. 56.  The moving party must show the absence of an issue

17  of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

18        However, in assessing the record to determine if such issues exist, all ambiguities and all

19  inferences must be resolved in favor of the plaintiff as the non-moving party.  *Anderson v. Liberty*

20  *Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Fischer v. Forestwood Co., Inc.,* 525 F.3d 972, 978 (10th Cir.

21  2008).  The court also may not make credibility determinations or weigh the evidence.  "Credibility

22  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

23  are jury functions, not those of a judge."  *Anderson.* 477 U.S. at 255.

24        "Thus, although the court should review the record as a whole, it must disregard all evidence

25  favorable to the moving party that the jury is not required to believe."  *Reeves*, 530 U.S. at 151

26  (citing 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299 (2d ed.1995)).

27  "That is, the court should give credence to the evidence favoring the nonmovant as well as that

28  'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent

1   that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151 (internal citations

2   omitted). "If reasonable minds could differ as to the import of the evidence … and if there is any

3   evidence in the record from any source from which a reasonable inference in the nonmoving party's

4   favor may be drawn, the moving party simply cannot obtain summary judgment." *R.B. Ventures,*

5   *Ltd. V. Shane*, 112 F.3d 54, 59 (2nd Cir 1997) (internal citations and quotations omitted); *T.W. Elec.*

6   *Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630-31 (9th Cir. 1987).

7       The Ninth Circuit "has set a high standard for the granting of summary judgment in

8   employment discrimination cases." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.

9   1996) (internal quotations omitted). The Ninth Circuit has stressed that it will "require very little

10  evidence to survive summary judgment" in employment discrimination cases because the "ultimate

11  question is one that can only be resolved through a 'searching inquiry' - one that is appropriately

12  conducted by a factfinder on the full record." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124

13  (9th Cir. 2000); *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1564 (9th Cir. 1994) (internal quotation

14  omitted). "The existence of an intent to discriminate may be difficult to discern in depositions

15  compiled for purposes of summary judgment, yet it may later be revealed in the face-to-face

16  encounter of a full trial." *Lam*, 40 F.3d at 1564.

17  **IV.   ARGUMENT**

18          **A.    Charging Party Hernandez's Alleged "Misconduct" was Caused by Her
                    Disability and is Therefore Part of Her Disability; and as such, it is Not a**
19                  **Justifiable Basis for Her Termination**

20          The Ninth Circuit Court of Appeals has repeatedly and unequivocally held that when an

21  employee's conduct is a result of his or her disability, then the conduct itself should be viewed as

22  part of the disability, and that disciplinary action, including termination, based on that conduct,

23  constitutes disability discrimination. The Ninth Circuit first articulated that standard in *Humphrey v.*

24  *Memorial Hospitals Association*, 239 F.3d 1128 (9th Cir. 2001), and has consistently applied it since

25  then; district courts in the Circuit have followed suit.

26          In *Humphrey*, Plaintiff  Humphrey suffered from obsessive compulsive disorder, which

27  caused her to go through multiple personal hygiene and grooming activities before she could leave

28  the house for work. This resulted in repeated absences and tardiness, in violation of the employer's

attendance rules. Following several disciplinary warnings and unsuccessful attempts to

accommodate her with a flexible work schedule and time off, the defendant employer terminated her

employment.   While the district court granted summary judgment in favor of the employer, the

Ninth Circuit reversed.  The Ninth Circuit held that if the absenteeism for which her employment

was terminated was caused by her disability of obsessive compulsive disorder, then the termination

was illegal under the Americans with Disabilities Act:

> For purposes of the ADA, with a few exceptions, conduct resulting from a disability
> is considered to be part of the disability, rather than a separate basis for termination.
> The link between the disability and termination is particularly strong where it is the
> employer's failure to reasonably accommodate a known disability that leads to
> discharge for performance inadequacies resulting from that disability.

*Id.* at 1139-1140.  The Ninth Circuit then set down a firm rule to be applied in employment cases

where disability related misconduct results in disciplinary action:

> The text of the ADA authorizes discharges for misconduct or inadequate performance
> that may be caused by a 'disability' in only one category of cases - alcoholism and
> illegal drug use.

*Id.* at 1140, fn. 18.

In establishing this prescript in *Humphrey*, the Ninth Circuit was echoing a line of reasoning

previously established by the Tenth Circuit in *Den Hartog v. Wasatch Academy*, 129 F.3d 1076

(10th Cir. 1997). In *Den Hartog*, a private schoolteacher was fired from his job due to his mentally

ill son's physical attacks and threats against schoolmates and the headmaster, and the schoolteacher

plaintiff filed for violation of the ADA on associational grounds.  While ultimately upholding the

district court's grant of summary judgment in favor of the employer (based on a "direct threat"

analysis), the Tenth Circuit in *Den Hartog* specifically rejected the dividing line the district court

had drawn between a disability itself and conduct related to that disability.  The Tenth Circuit stated

that the text of the ADA makes "only one specific reference to "disability related misconduct" for

which an employer is authorized to hold the disabled employee to the same standard of conduct as a

non-disabled employee, and that reference is to conduct resulting from the use of alcohol or illegal

drugs.  The Tenth Circuit then adopted the plaintiff's position that there is no manifestation of

Congressional intent to draw a distinction between a disability and disability related misconduct in

circumstances other than misconduct associated with alcohol or use of illegal drugs. *Den Hartog*,

129 F.3d at 1085-1087.  The Circuit Court additionally noted that while the ADA also permits an employer to refuse to make a reasonable accommodation if it would cause undue hardship, and permits an employer to take action against an employee who poses a direct threat to health or safety, there is a necessary corollary:

> The availability of these affirmative defenses establishes that there are certain levels of disability-caused conduct that need not be tolerated or accommodated by employers. However, the necessary corollary is that there must be certain levels of disability-caused conduct that have to be tolerated or accommodated.

*Id.* at 1087.

The Ninth Circuit's decision in Humphrey is not an aberration.  On the contrary, the Ninth Circuit reinforced that holding in *Dark v. Curry County*, 451 F.3d 1078 (9th Cir. 2006), and *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087 (9th Cir. 2007), and district courts in the Circuit have followed suit.  In *Dark*, the plaintiff, who drove construction vehicles as part of his job as a public works employee, suffered from epilepsy.  Plaintiff Dark would normally experience an "aura" prior to an oncoming seizure, and experienced one on the morning of the incident which led to his termination.  Nevertheless, he proceeded to work, and drove the county pickup truck.  While driving, he experienced a seizure and lost consciousness; luckily another worker was able to bring the truck to a safe stop.  Defendant county terminated his employment, a termination affirmed by the county board of commissioners, which asserted that he "acted irresponsibly, recklessly, and total disregard of the safety of himself, other employees, and members of the public."  *Id.* at 1081-0182.

Dark sued the county under the ADA.  The district court ruled in favor of the county on summary judgment; the Ninth Circuit reversed, finding that the "misconduct" of which formed the basis of Dark's termination was related to and therefore part of his disability, and that termination based on it without the county establishing a defense, such as direct threat or undue hardship, was discriminatory.

In *Gambini*, the Ninth Circuit again clearly articulated its position that disability related "misconduct" is a manifestation of the disability itself, and disciplinary action, including termination, taken because of that conduct could not only be found to be disability discrimination, but in addition, the district court's failure to give a jury instruction to that effect was reversible error.

Plaintiff Gambini suffered from bi-polar disorder; she had been having performance problems and was called into her supervisor's office and given a performance improvement plan.  Gambini became so upset that she threw the document back at the supervisor, shouted profanities, returned to her cubicle where she proceeded to kick and throw things, and stormed out of work.  Her employer fired her because of this conduct.  Her case went to trial in the district court, and she lost; the Ninth Circuit reversed.  The Ninth Circuit held that the trial court should have given the jury an instruction that "[c]onduct resulting from a disability is part of a disability and not a separate basis for termination," and that the failure to give such an instruction was reversible error.  486 F.3d at 1093-1094.

As stated above, district courts in the Ninth Circuit have followed the Court of Appeals' reasoning when addressing disability related "misconduct."  In *Brown v. City of Salem,* 2007 WL 671336 (D. Ore. 2007), an emergency (911) call dispatcher with sleep apnea was terminated after falling asleep at work numerous times. The district court found that the employer had violated the ADA in terminating the employee, and, citing *Dark* and *Humphrey*, held that "it is plain that conduct resulting from the disability is considered to be a part of the disability and termination based on that conduct is unlawful."  *Brown* at *6.

Likewise, in *Menchaca v. Maricopa Cmty. Coll. Dist.*, 595 F.Supp.2d 1063 (D.Ariz.2009), an Arizona district court rejected an employer's bid for summary judgment in the ADA case of an employee who suffered from traumatic brain injury.  The defendant community college district had terminated the employee after she shouted at the department chair, when he questioned her hours, that she would "come back and kick your ass."  The defendant argued on summary judgment that, while recognizing that the Ninth Circuit regarded disability related misconduct as part of the disability itself, the court should recognize an exception for "egregious and criminal" misconduct, and apply that to the plaintiff's conduct.  The district court disagreed.

The *Menchaca* court first noted that the purported exception for "egregious and criminal" misconduct came from a 1996 Rehabilitation Act case, *Newland v. Dalton*, 81 F.3d 904 (9th Cir. 1996), in which a civilian employee working at a military combat center was terminated after a "drunken rampage" in which he attempted to fire an assault weapon at patrons in a bar.  The

1  *Newland* plaintiff asserted he had been terminated because of his disability, alcoholism.  The district

2  court in *Newland* had found that the termination did not constitute disability discrimination, and the

3  Ninth Circuit affirmed, finding that "[a]ttempting to fire a weapon at individuals is the kind of

4  egregious and criminal conduct which employees are responsible for regardless of any disability."

5  As the *Menchaca* court explained, however, the Ninth Circuit has never carved out an additional

6  exception to its position that misconduct which results from a disability is part of the disability itself;

7  that the only exceptions relate to misconduct related to alcohol or illegal use of drugs; and that "the

8  Ninth Circuit has repeatedly declined to decide whether Newland's concluding remark sets out an

9  exception or was merely a rhetorical flourish."  595 F.Supp.2d at 1074.

10       As stated above, the Tenth Circuit has followed a similar line of reasoning as the Ninth in

11  finding that a distinction should not be drawn between a disability and conduct which results from

12  that disability, except in cases of alcohol or illegal use of drugs.  The case of *Walsted v. Woodbury*

13  *County*, 113 F.Supp.2d 1318 (N.D. IA 2000), illustrates this Tenth Circuit approach.  In *Walsted,* a

14  custodial employee with intellectual disabilities had taken the wallet of another employee from that

15  employee's purse and hidden it.  When the employee whose wallet was taken discovered this, she

16  contact the county sheriff, and in a subsequent interview by the sheriff, plaintiff Walsted admitted

17  having taken it.  She was charged with theft in violation of Iowa law, was suspended without pay

18  from work, referred to the employee assistance program, and given a memo explaining the

19  expectations for her future conduct at work.  Two years later, the sheriff's office received a report of

20  the theft of automobile registration stickers from the Department and surveillance videos revealed

21  that Plaintiff Walsted was taking them.  She was arrested, admitted that she had taken the stickers,

22  but asserted that she was practicing wrapping boxes and used the stickers to seal the boxes.  The

23  same day as the arrest, the county terminated her employment.  She sued under the ADA, and the

24  district court refused to grant summary judgment to the defendant county, affirming *Den Hartog*,

25  *supra*, that:

26      As a general rule, an employer may not hold a disabled employee to precisely the
    same standards of conduct as a non-disabled employee unless such standards are job-

27      related and consistent with business necessity. . . . Pursuant to 42 U.S.C. 12114(c)(4),

28

14

employers need not make any reasonable accommodations for employees who are illegal drug users and alcoholics. However, that is in marked contrast to all other disabilities, where the ADA does require that the employer extend reasonable accommodations. Thus, the disability v. disability-caused conduct dichotomy seems the disability v. disability-caused conduct dichotomy seems to be unique to alcoholism and drugs.

113 F.Supp.2d at 1340-1341.

The cases cited by Defendant do not negate this analysis.  While Defendant cites *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003), *Raytheon* in fact does not weigh in on the disability and disability related conduct dichotomy issue other than in dicta in a footnote, where the Court simply notes that to the extent that the lower court suggested that the petitioner employer's failure to rehire the respondent employee because of workplace misconduct, which in the *Raytheon* case was testing positive for cocaine, violated the ADA, the Court had "rejected a similar argument in the context of the Age Discrimination in Employment Act."  *Id.* at 55, fn. 6.  Besides the obvious distinction that *Raytheon* dealt with illegal drug use rather than diabetes, that the Ninth Circuit's position is not negated by *Raytheon* is evident in that both *Dark (2006)* and *Gambini (2007)* were decided *after Raytheon*.  In *Jones v. American Postal Workers Union*, 192 F.3d 417 (4th Cir. 1999), a Rehabilitation Act case decided in 1999 in a different  Circuit, the Court found that there was "absolutely no evidence to suggest that [the employee was discharged] for any reason other than the fact that he threatened the life of his supervisor" and the law is "well settled" that a discharge for disability related misconduct is not a violation of the ADA (*Id.* at 429); this is not the law in the Ninth Circuit.  Like *Siefken*, discussed at length *infra.*, not only was *Jones* decided in a different Circuit and in a much earlier time in the development of disability discrimination law, but should it have been decided in the Ninth Circuit, the employee's termination could have been easily justified through a direct threat defense.  *Ray v. Kroger Co.*, 264 F.Supp.2d 1221 (S.D.GA. 2003), simply follows the Fourth Circuit's position in *Jones,* which, again, is not the position of the Ninth Circuit.[3]

Clearly Ms. Hernandez's eating of the chips was not related to the use of either alcohol or

---

[3]  *Sena v. Weyerhaeuser*, 1999 U.S. App. LEXIS 499 (9th Cir. 1999), cited by Defendant is an unpublished decision.  Given that the case was decided in 1999, it does not come under the exception of Fed.R.App.P. 32.1 for unpublished decisions after January 1, 2007, and it should not have been cited by Defendant.

illegal drugs.  Moreover, even if an additional exception is recognized to create a dichotomy
between disability and disability related misconduct for criminal and egregious conduct (which, as
stated above, has never been recognized by the Ninth Circuit), Ms. Hernandez's consumption of a
few potato chips to quell her hypoglycemic attack would surely not come under such an exception as
"criminal and egregious."[4]  Finally, Ms. Hernandez's consumption of the potato chips clearly does
not come under the "direct threat" exception; on the contrary, her consumption of the chips was
instead an immediate action to *avert* a direct threat to herself, which could have occurred if she
allowed her hypoglycemia to continue into more serious territory, which could have resulted in her
passing out, and ultimately, if left unremediated, coma and death.

Thus, the only defense remaining to Defendant is undue hardship.  To maintain that defense,
Defendant will have to establish that refraining from terminating Ms. Hernandez's employment
because of her consumption of a few chips in response to her hypoglycemia, would have caused
Walgreens an undue hardship.  To date, the only defense along those lines that Defendant has
presented is that it needs to impose its policies regarding "grazing" across the board, and make no
exception for disabled employees.  In fact, Defendant's reasonable accommodation policies
specifically state that no exceptions need be made.  Walgreen's written disability policy states, in its
"Frequently Asked Questions and Answers" section:

> Q.	Can I discipline an employee with a disability who violates the conduct rule?
>
> A.	Yes, Walgreens never has to excuse an employee for violating a uniformly
> applied conduct rule.

(O'Hara Decl., Ex. 14 [Clark Depo Ex. 5].)  This "across the board" policy is clearly not compliant
with the disability related misconduct standards set by the Ninth Circuit, and, under the precedent of
this Circuit, Walgreens will be hard pressed to establish that making an exception to its "zero

---

[4]  Even though Defendant characterizes employee "grazing" as "theft," Ms. Hernandez's conduct can
hardly be termed "criminal."  After eating the chips, instead of disposing of the evidence,
Ms. Hernandez put the half-eaten bag at her own cash register station to pay for them later; as Holly
Potter testified, when she found the chips, and asked whose they were, Ms. Hernandez voluntarily
said that they were hers; when Potter said that she would put them in the locker room, Hernandez
protested that she had not yet paid for them, and at that point Potter took them to Balestieri.  (O'Hara
Decl., Exh. 4 [Potter Depo] at 34:18-35:4.)  Thus Ms. Hernandez's actions are the exact opposite of
those that would be taken by someone who actually wanted to "steal" the chips.

tolerance" policy, in light of Ms. Hernandez's disability, would have been an undue hardship.

**B.    When an Employer Knows of an Employee's Disability, and Recognizes that the Employee is having Difficulty as a Result, the Employee does not Specifically Need to Request a "Reasonable Accommodation"**

Defendant argues that it should be found not liable for failure to accommodate Ms. Hernandez's disability, which it could easily have done by excepting Ms. Hernandez's chip consumption from its "zero tolerance" policy, because she did not specifically request a reasonable accommodation. Defendant's argument must fail.

Defendant's reliance on *Brown v. Lucky Stores*, 246 F.3d 118 (9th Cir. 2001), is misplaced. In *Brown*, the employee was absent from work due to being arrested for drunk driving, possession of methamphetamine and being under the influence of an illegal controlled substance, and held in jail for five days; she was then placed in a ninety day, round the clock rehabilitation program. Although she had her sister in law contact her employer on the first day of her incarceration to inform the employer that she was in jail and would miss work that day, neither the plaintiff nor anyone speaking on her behalf contacted her employer after that time to explain her continued absence, and she was therefore terminated for job abandonment. Thus the plaintiff never informed that her absence was due to her alcoholism disability, nor ever requested any accommodation for same; in fact there is no evidence that the employer was even aware of her disability.

In contrast, Defendant Walgreens was fully on notice of Ms. Hernandez's diabetes. Both Kathy Marsh, who supervised Ms. Hernandez as her store manager for 15 years prior to Mr. Balestieri's taking over supervision of the store, and Holly Potter, who was assistant store manager at the time of Ms. Hernandez's eating the chips and subsequent termination for having done so, knew that Ms. Hernandez had diabetes.[5] Moreover, Ms. Hernandez verbally informed both Balestieri and Clark that she had eaten the chips because of her low blood sugar, and gave them the written statement that she had consumed the chips before paying for them because "[m]y sugar low, not have time." Under such circumstances, with knowledge of Ms. Hernandez's disability, and of the fact that her "misconduct" was caused by her disability, Defendant could have and should have

---

[5] (O'Hara Decl., Exh. 3 [Marsh Depo] at 10:5-18; Exh. 4 [Potter Depo] at 18:7-23.)

1   made an exception for her conduct as a reasonable accommodation, instead of terminating her

2   employment.  As stated in *Norris v. Allied Sysco Food Services, Inc.*, 948 F.Supp. 1418 (N.D. CA

3   1996):

> We begin this discussion by noting that our review of the EEOC's interpretations and
> the applicable case law discloses the following general principles about an employee's
> burden to request reasonable accommodation. In general, an employee must request
> reasonable accommodation from an employer in order for the employer's duty to
> reasonably accommodate the employee to be triggered. [fn. omitted] However, if an
> employee's disability and the need to accommodate it are obvious, an employee is not
> required to expressly request reasonable accommodation. [fns. omitted]

8   *Id.* at 1436.  Thus the court in *Norris* specifically instructed the jury that "[a]n employee is not

9   required to expressly state to an employer that the employee is disabled and requires accommodation

10  if it would be clear to a reasonable employer that the employee is disabled and requires and wants

11  accommodation."  *Id.* at fn 18.

12       The Seventh Circuit has similarly found a violation of the ADA for and employer's failure to

13  accommodate an employee, even when the need became evident after the employee had been

14  terminated.  In *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir. 1996), a

15  school custodian with bipolar disorder, anxiety attacks and schizophrenia was in the process of

16  returning from an extended disability leave.  He was assigned to work at a new high school, much

17  larger than the previous school where he worked; the plaintiff employee went to see the new school

18  and told the school district's employee relations director that he could not work there.  He

19  subsequently failed to report to both his pre-return physical and his first day of work, and was

20  terminated as a result.  A few hours later, he delivered a note from his physician, stating that it would

21  be in the plaintiff employee's "best interest" to return to work at a different school that "might be

22  less stressful."  He received no response.

23       In reversing the district court's summary judgment ruling in favor of the school district, the

24  Seventh Circuit rejected the district's contentions that the plaintiff employee had never asked for a

25  reasonable accommodation, and that the note from his doctor was "too little, too late."  The Seventh

26  Circuit noted that the reasonable accommodation process requires a great deal of communication,

27  and that an employee is not required to specifically say "I want a reasonable accommodation;"

28  moreover, the Court of Appeals held that the fact that the doctor's note arrived after the district had

1   already terminated the plaintiff was no excuse: "[The district] could have used the opportunity it

2   presented to reconsider the decision to terminate his employment . . . That would have been the

3   proper way to engage in the interactive process. . . . It appears [the district] tried to take hasty

4   advantage of what it saw as an opportunity to rid itself of a problem, a disabled employee."

5   *Bultemeyer,* 100 F.3d at 1286.

6          In the case of Ms. Hernandez, the termination process was not nearly as far along as that in

7   *Bultemeyer.*  When Ms. Hernandez told Balestieri and then Clark, and then submitted her written

8   statement that her reason for eating the chips was "My sugar low, not have time," Walgreens, fully

9   aware that Ms. Hernandez had diabetes, should have taken the opportunity to explore with

10  Ms. Hernandez what had gone wrong, and how it could be avoided in the future; instead, it simply

11  proceeded with her termination.

12         Discovery in this case revealed a probable explanation for Defendant's failure to grasp its

13  accommodation obligations.  While both store manager Marsh and loss prevention supervisor Clark

14  asserted that they had had training in disability discrimination, both testified that their training had

15  not included reasonable accommodation![6]  This lack of training, coupled with Defendant's legally

16  incorrect policy that no exceptions need be made to accommodate employee misconduct caused by a

17  disability, it is little wonder that it now claims that it had no obligation to accommodate

18  Ms. Hernandez's conduct.

19         **C.     The Ninth Circuit has not Created an Exception to Employer ADA Obligations
                    for an Employee's Failure to Perfectly Control the Symptoms of His or Her
20                  Disability**

21         Defendant has argued that Ms. Hernandez could have had a piece of candy in her pocket to

22  treat her low blood sugar and, because she did not, and instead, in desperation, ate a few chips before

23  paying for them, Defendant should be not be found liable.  Defendant urges that this Court adopt the

24  1995 position of the Seventh Circuit in *Siefken v. Village of Arlington Heights,* 65 F.3d 664 (7th Cir.

25  1995), and uphold Ms. Hernandez's termination as a matter of law.  But *Siefken* is an anomalous

26  case, decided early in the development of ADA case law, and its reasoning is not that of the Ninth

27

28  _____
    [6] (O'Hara Decl., Exh. 3 [Marsh Depo] at 21:10-13; Exh. 9 [Clark Depo] at 16:20-23.)

1   Circuit.

2       In *Siefken*, a probationary police officer was experiencing a "diabetic reaction" which

3   resulted in disorientation and memory loss; while in this state, he erratically drove his police car at

4   high speed through a residential neighborhood forty miles outside of his jurisdiction, and remembers

5   nothing of the trip.  He was pulled over by other police officers, placed on administrative leave, and

6   subsequently terminated.  The Seventh Circuit held that the officer's termination did not violate the

7   ADA.  In its opinion, the Court of Appeals speaks neither of whether there should be a distinction

8   between a disability and disability related misconduct, nor about the direct threat to safety caused by

9   Siefken's conduct; instead the Court of Appeals appears to have held that since the police

10  department had hired the officer knowing that he was diabetic, then it had not engaged in disability

11  discrimination.  Moreover, the Court held that it had never held a "but for" causation standard in an

12  ADA case (i.e. but for the individual's disability, the adverse action would not have occurred), and

13  that the "more immediate cause" of the incident that led to the officer's termination was his failure to

14  adequately monitor and remediate his diabetic condition.

15      As stated above, the reasoning of *Siefken* has not been adopted by the Ninth Circuit, nor

16  would it likely be.  First, in this Circuit, it is clear from the holdings in *Humphrey*, *Gambini* and

17  *Dark* that disability related conduct is part of a disability, and not something separate from it.

18  Moreover, it would be quite unusual if courts were to create a *Siefken*-like exception to an

19  employer's ADA obligations; courts would have to try to determine, as a matter of law, whether an

20  employee had "done enough" to try to monitor, treat, and control the symptoms of his or her

21  disability, a determine better left to the medical profession than the courts.  Finally, the Ninth Circuit

22  has very well developed legal precedent concerning the direct threat defense (See *Echazabel v.*

23  *Chevron U.S.A*, which arose in and returned to this Circuit following the ruling of the Supreme

24  Court[7]), and a police officer whose disability and/or disability related conduct caused him to drive

25  erratically and at high speeds through residential areas, forty miles outside of his jurisdiction, with

26

27  _____

    [7]  *Chevron U.S.A. Inc. v. Echazabal*,  536 U.S. 73, 122 S.Ct. 2045 (2002), arising from *Echazabal v.*
    *Chevron USA, Inc.*,226 F.3d 1063 (9th Cir. 2000), and on remand, *Echazabal v. Chevron USA*, Inc.,

28  336 F.3d 1023 (9th Cir. 2003).

no memory of same, would certainly found to be a direct threat to himself and others, without even

having to consider whether there was a dichotomy between his disability and the conduct caused by

it.

In addition to these legal discrepancies with the probable reasoning which would be applied

should the *Siefken* case come before the Ninth Circuit in 2014, as opposed to the Seventh Circuit

under ADA law as it stood in 1995, the facts of Ms. Hernandez's situation are quite different than

those of officer Siefken:  Ms. Hernandez was stocking shelves in a retail store, not driving erratically

at high speed through residential area; the effects of Ms. Hernandez's diabetes related hypoglycemic

episode were not a direct threat to anyone else; and in fact, the actions that she took in eating the

chips were taken precisely to *avert* a direct threat to herself, i.e. passing out from hypoglycemia.  In

short, Defendant should not be relieved of liability simply because Ms. Hernandez did not have a

piece of candy in her pocket, and she should not be forced to continue to suffer the consequence of

Defendant's failure to follow its obligations under the ADA.

### D.   Defendant's Position that Plaintiff must Establish Pretext is Incorrect and in any Event Plaintiff has shown Pretext in this Case

Defendant argues that after Plaintiff has established a prima facie case, and Defendant has

proffered evidence of a legitimate non-discriminatory reason, then Plaintiff "must" demonstrate

pretext.  (Docket #66 [Defendant's MSJ] at 22:12-13.)  This interpretation of the law is incorrect.

As the Supreme Court explained in the case of *Reeves v. Sanderson,* 530 U.S. 133 (2000):

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.  [citation omitted]

*Id.* at 147.

The Court also stated:

> That is, the plaintiff *may* attempt to establish that he as the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence."  [citation omitted and emphasis added]

*Id.* at 143.

While proof of pretext is not necessary, Plaintiff can establish pretext in this case.

Defendant's managers falsely claimed that Ms. Hernandez did not tell them that she ate the chips

1    because of her low blood sugar caused by her diabetes.  (O'Hara Decl., Exh. 9 [Clark Depo] at

2    26:10-27:3; Exh. 5 [Balestieri Depo] at 17:2-18:21.)  In fact, Ms. Hernandez had told them. (O'Hara

3    Decl., Exh. 1 [Hernandez Depo, v.I] at 80:19-81:9; Exh. 8 [Clark Depo Ex. 1].)  Because of

4    Defendant's managers providing false information to cover up the fact that they knew

5    Ms. Hernandez had eaten the chips because of her diabetes constitutes evidence of pretext.

6    **E.    The Commission is not Barred from Litigating this Case**

7    Defendant claims that the EEOC is precluded from pursuing this action because § 713(b) of

8    Title VII (42 U.S.C. § 2000e-12(b)) bars the EEOC from bring actions against employers who have

9    followed its guidelines.  (Docket #66 [Defendant's MSJ] at 19-20.)  But in this case, the

10   Commission has alleged a violation of the Americans with Disabilities Act, as amended (the

11   "ADA")(42 U.S.C § 12101 *et seq*.), not Title VII.  The ADA does not incorporate § 713(b) of Title

12   VII, nor is there a comparable section in the ADA to § 713(b) of Title VII.  Accordingly, § 713(b) of

13   Title VII simply does not apply at all to this case, and there is no basis to dismiss the Commission's

14   claim pursuant to § 713(b) of Title VII.

15   Defendant also argues that the Commission's case is inconsistent with an EEOC guideline

16   that indicates that an employer may enforce a uniformly applied conduct rule that is job-related and

17   consistent with business necessity.  56 Fed. Reg. 35, 733 (1990).  However, this guideline, which

18   was published nearly a quarter of a century ago in 1990, was been superseded by subsequent

19   developments in the case law.  In *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391 (2002), the Supreme

20   Court held that an employer's disability neutral rule may violate the ADA.  The Court reasoned:

21   > By definition any special "accommodation" requires the employer to treat an
22   > employee with a disability differently, i.e., preferentially.  And the fact that the
     > difference in treatment violates an employer's disability-neutral rule cannot by itself
23   > place the accommodation beyond the Act's potential reach.

24   *Id.* at 397.  *See also, Mcalindin v. County of San Diego,* 192 F.3d 1126, 1237 (9th Cir. 1999): ("The

25   essence of the concept of reasonable accommodation is that, in certain instances, employers must

26   make special adjustments to their policies for individuals with disabilities.")  Thus, because the law

27   has evolved since the EEOC guideline was published in 1990, the Commission is not barred from

28   pursuing this action.

**F.      Punitive Damages are Available to the Commission in this Case**

Punitive damages are available where the employer has engaged in conduct "with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Egregious misconduct is not required to justify punitive damages. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536-537 (1999). The standard is whether the employer had "at least discriminate[d] in the face of a perceived risk that its actions will violate federal law." *Id.* Under *Kolstad*, liability for punitive damages requires a showing that: (1) that the employer acted with the requisite mental intent, i.e. the employer knew it was acting in reckless disregard of the law; and (2) that the employees who discriminated against the plaintiff were managerial agents of the employer acting within the scope of their employment. 527 U.S. at 535-43.

Here, the EEOC has established that its managers were aware that disability discrimination violated federal law, and yet proceeded to terminate Ms. Hernandez, when they knew or should have known her conduct was a result of her disability. Marcellus Clark, the Loss Control Manager, testified that he knew that disability discrimination violated federal law. (O'Hara Decl., Exh. 9 [Clark Depo] at 44:9-11) Clark also testified that he reviewed Ms. Hernandez' statement where she indicated that she ate the potato chips because her "sugar was low." (*Id.* at 29:10-21; Exh. 8 [Clark Depo Ex. 1].) He testified as follows when asked about Hernandez' statement:

> Q      Under the line "18 year," there's another line of handwriting, Ms. Hernandez' handwriting. Did you look on October 6th of 2008?
>
> A      Yes.
>
> Q      And what was your understanding of what that meant?
>
> A      I didn't understand it, so I didn't try to read it.
>
> Q      Does it say, "My sugar low, not have time"?
>
> MR. PLAMONDON: Objection. The document speaks for itself.
>
> THE WITNESS: When I looked at it, it looked like "moy" something, and I stopped trying to read it.
>
> BY MR. LAURA:
>
> Q      Did you ask her what she was trying to say in this writing?
>
> A      No.
>
> Q      You didn't ask her?
>
> A      No.

(O'Hara Decl., Exh. 9 [Clark Depo] at 30:17-31:8.)

1    Clark's testimony about his reckless conduct of not even bothering to hear what

2    Ms. Hernandez had to say when he was on notice that she had a disability clearly demonstrates that

3    he was acting in the face of a perceived risk that his actions would violate federal law.

4    Similarly, the Store Manager, Mr. Balestieri was aware that disability discrimination violated

5    federal law.  (O'Hara Decl., Exh. 5 [Balestieri Depo] at 13:22-14:2.)  He also falsely claimed that

6    Ms. Hernandez did not tell him that she had eaten the chips because her blood sugar was low in

7    order to cover up his wrongful conduct.  (*Id.* at 17:2-18:21.)  The draconian and discriminatory

8    conduct of Defendant's managers, when they knew that disability discrimination was against the

9    law, is more than enough to warrant punitive damages in this case.

10   **V.     CONCLUSION**

11   For all the foregoing reasons, Defendant's Motion for Summary Judgment or, in the

12   Alternative, Partial Summary Judgment, should be denied in its entirety

13

14   Dated:  February 11, 2014                    */s/ Cindy O'Hara*
                                                  CINDY O'HARA
15                                                PETER F. LAURA
                                                  Attorneys for Plaintiff EEOC
16

17

18

19

20

21

22

23

24

25

26

27

28